Farrell, Senior Judge, concurring in part and dissenting in part: I agree with the'court that the gloves admitted in evidence did not pass the test of relevance. But, unlike my colleagues, I am not convinced that the gloves and the accompanying testimony by Officer Simic about the gloves had any material effect on the jury’s verdict. The combined identifications of appellant as someone who jumped out of the window of the victim’s apartment was very strong; appellant explained his capture minutes later with the victim’s property in his pocket by a story that taxed the credulity of any reasonable juror; and the -glove evidence • ultimately played a minimal part in the prosecutor’s argument of the case to the jury. First, as to the glove testimony. Officer Simic did indeed testify, without adequate foundation, that the gloves introduced in evidence were those appellant had been wearing when he opened the door in response to Simic’s knock. But in his opening summation the prosecutor devoted only five sentences of some thirty transcript pages of argument to the gloves, and appellant’s counsel in response suggested why; [Simic] gave a description of someone with gloves. Who else said that? Absolutely, no one. Mr. Smith, upon arrest, [had] no gloves. The government says, well, ... these are the gloves' [in Govt. Exhibit 31, a photograph]; [w]here did that come from? The officers that arrested ‘ Mr. Smith ... [and] searched Mr. Smith, 'they didn’t say anything about recovering gloves from [him]. You never heard any evidence of where this ... pair of gloves came from. Unsurprisingly, in his rebuttal argument the prosecutor did not mention the gloves again. Far from depending on the (incredible shrinking) evidence of the gloves, the government’s case was built on the identification of appellant by three officers as one of the men each. saw jump from the victim’s apartment window, after which appellant fled down Good Hope Road before he was found hiding and in possession of the victim’s wallet and other personal property. Simic, from eight or nine yards away, saw appellant, wearing dreadlocks, hunched over in the window before he jumped and started running down Good Hope Road. Officer Ellis likewise saw appellant, “the man with the dreads,” crouch and jump from the window and begin running after she yelled to him not to. She “had [her] eyes on [appellant] until [she] saw” Officer Hernandez take up the chase. -Ellis, as the court notes, initially confused appellant with codefendant Roberson in court and claimed not to see him there, but she soon corrected herself (“He is here. I’m sorry. I didn’t see him”) and unequivocally identified appellant, “sitting there .. with the long dreadlocks,” as the man she had seen jump from the window and run down Good Hope Road. Lastly, Officer Hernandez heard Ellis yell “don’t jump,” then saw appellant jump from the window and run down Good Hope Road. Hernandez pursued him in' his vehicle, then alighted and chased him on foot down an embankment, where appellant was found hiding in the woods with; the victim’s possessions. My colleagues assert that Hernandez -never actually said that appellant and the man who jumped were the same, only that he later learned of that fact (appellant “was later identified as Joseph Smith.”) But regardless of when Hernandez learned appellant’s name, no one hearing his testimony as a whole would have reasonably doubted that in his mind appellant, “wearing ,.. dreads in the back and ... a red striped shirt” in court, was the same person Hernandez identified from on-scene- arrest photos as the man he had chased and caught after watching him jump from the window and run. As the court points out, the jury could also credit a fourth officer’s testimony that appellant, in the squad car, admitted that “we” — he and others — had jumped out of the window of the victim’s apartment. But, of course, appellant told a different story at trial’about how he was caught seemingly red-handed with the victim’s property. As he was walking home from a store, a stranger inside a nearby building asked his help in hoisting, a TV out of a window (a window some nine feet above ground). Appellant agreed to, but then the man suddenly jumped out of. the window, dropping some items as he dids and ran away. Appellant picked up and pocketed the items, including a wallet and an MP3 player, and when he saw a police car approach he ran and eventually hid in the woods. Appellant could offer no description of the naan who jumped and ran, nor did he explain why he fled the police and hid or what he intended to do with the pocketed items. They were, as his lawyer imagined his thinking in closing argument, “good and valuable stuff’; “I’ll take it. Why not?” Appellant’s counsel, in characterizing the government’s case to the jury, might well have been commenting on appellant’s own story: “it sounds a little bit crazy.” For all of these reasons, I see no reasonable, realistic possibility that the jury was influenced by the glove evidence in finding appellant guilty, under whichever standard of review the court applies. See ante at [628] n.4.1 reach the samé conclusion of no prejudice as to appellant’s other assignments of error as well.